# EXHIBIT A

# Claimant's Submission

PUBLIC LAW BOARD NO. 7694
ESTABLISHED TO DISPOSE OF CERTAIN DISPUTES INVOLVING EMPLOYEES
REPRESENTED BY
BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN
EASTERN LINES GERNERAL COMMITTEE OF ADJUSTMENT

PARTIES          ) BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN
TO               ) EASTERN LINES GENERAL COMMITTEE OF ADJUSTMENT
DISPUTE          )

VS

CSX TRANSPORTATION, INC.

CASE NO. 23

J.P. Bennett (ID 239613)

## STATEMENT OF CLAIM:

Claim of CSXT Locomotive Engineer J.P. Bennett (CSXT ID 239613) for full reinstatement to the service of CSXT as Locomotive Engineer.  Such reinstatement to include removal of all Record of Discipline administered by CSXT in this case, from Engineer Bennett's Personal Service Record, full pay for all time lost, cumulative vacation and personal leave day rights undisturbed, seniority standing and progression unimpaired, all Health & Welfare benefits intact and unreduced, full restoration of all other rights thereto pertaining to Engineer Bennett's employment with CSX Transportation, Inc.

## EMPLOYEE'S STATEMENT OF FACTS:

1

On January 03, 2014 Engineer J.P. Bennett (hereinafter Claimant) was assigned to train Q41002 working between Waycross, GA and Savannah, GA. Claimant and his Conductor arrived for duty at 1930 hours on January 2, 2014 and began gathering all documentation necessary to depart. Crew then performed a job briefing detailing work to be performed on their service trip as well as any restrictions which would apply to their train. At approximately 0005 hours on January 03, 2014 in the vicinity of milepost AN 584.4, Claimant encountered a temporary reduce speed sign which marked the beginning of a twenty-five (25) mph speed restriction. Claimant applied the automatic brake in order to reduce speed in accordance with the temporary speed restriction and completed his trip to Savannah, GA without incident. Road Foreman of Engines (RFE) Bush received an Event Recorder Automated Download (ERAD) notification of a possible over speed incident on train Q41002. Upon reviewing the ERAD report, RFE Bush determined Claimant entered the twenty-five (25) mph temporary speed restriction at thirty-nine (39) mph. RFE Bush then contacted Jacksonville Division Assistant Manager C.G. Worth who issued instructions to remove Claimant and Conductor from service pending investigation.

By letter dated January 13, 2014, written over the signature of CSXT Jacksonville Assistant Division Manager C.G. Worth, Claimant was directed to attend a formal investigation on January 23, 2014, commencing at 0900 hours in Conference Room, 1401 Staley Avenue, Savannah, Georgia. Such to be conducted in connection with a charge that information was received on January 3, 2014 at approximately 0005 hours, while working Q41002, in the vicinity of milepost AN 584.4 and AN 584.5, he had operated his train 14 mph over the maximum authorized speed, and all circumstances

2

relating thereto.  Conductor P.R. Thomas was charged under separate letter of same date.  As a result of this formal investigation, Claimant was notified by letter dated February 21, 2014, written over the signature of CSXT Jacksonville Division Manager D.K. Jones that he was dismissed from the service of CSXT effective immediately.  This dismissal decision was appealed in letter dated March 10, 2014 by BLET Representative (M.M. Harvey) having jurisdiction to CSXT Labor Relations Highest Designated Officer (HDO) H.J. Garcia who in turn issued a denial response dated April 28, 2014.  The case was then referred to the BLET Eastern Lines General Chairman (G.D. Best) for further handling under the applicable portions of the current BLET Agreement (i.e. CSXT Labor Agreement 1-023-07 Article 30) governing discipline procedure on this property.  The case was properly handled on the property in accordance with the controlling agreement and conferenced by the BLET General Chairman with the Highest Designated Officer of CSXT Labor Relations who issued a denial decision.  The Organization now places this case before this Board for final adjudication pursuant to the Railway Labor Act, as amended.

**EMPLOYEE'S POSITION:**

First it must be stated that the Claimant has in no way attempted to deny his responsibility as it pertains to abiding by CSX Transportation Operating rules.  In fact, while under questioning by Hearing Officer Brown, during the formal investigation, he readily admits his error in operating his train in excess of the posted speed on this date, as is demonstrated by the following exchange: **(Tr. 36, ll. 40-45 & Tr. 37, ll. 1-6)**

**Bennett:** "Because I just stated I knew the speed order was there and I did not want to exceed the speed that I was going at I knew I

3

**needed to do something you know quickly because the train speed down for the safety of the crew?"**

**Brown:** **"How fast were you operating?"**

**Bennett:** **"I, I don't know.  We have everything here tells me how fast we were operating so whatever this says when we got there is was 39 miles an hour then that's what we have to go by.  Just knew I knew we needed to get the train speed down to get to the 25 mile an hour on the slow order. "**

While the Claimant takes responsibility for his actions, he also offers a valid explanation as to how this incident occurred.  Claimant testified that he was fully aware that a temporary speed restriction of twenty-five (25) mph existed at the location in question and he and Conductor had discussed this restriction during their initial job briefing after arriving for duty. **(Tr. 35, ll. 40-44 & Tr. 36, ll. 1-13)**  As entered into evidence by RFE Bush, the Claimant was issued Dispatcher Messages upon arriving for duty which informed Crew of the twenty-five (25) mph speed restriction on the Jesup Subdivision between mileposts AN 585.4 and AN 584.5 on the Main Track. **(Tr. Carrier Exhibit H)**  The Carrier's Exhibit H further shows the twenty-five (25) mph restriction in question had signs in place to mark the limits of the restriction as well as "warning boards" which would be placed approximately two (2) miles on either side of the restriction to act as a reminder to approaching trains. **(Tr. Carrier Exhibit H)**  During the formal hearing the Claimant and Conductor both testified that they did not encounter the warning signs which should have been in place to alert them of the upcoming restriction.

**(Tr. 29, II. 1-10 & Tr. 37, II. 28-31)**  No testimony was provided by Carrier Witness, RFE Bush and no evidence was entered discounting the Claimant's assertion that the signs were not properly placed.  This only leads to the conclusions that the Carrier either performed no investigation to determine the veracity of this claim or the Carrier does not dispute the signs were not properly placed.

Furthermore, the Carrier did not submit a full locomotive download as evidence, only a portion of the ERAD report which showed the Claimant entering the speed restriction at thirty-nine (39) mph. **(Tr. Carrier Exhibit E)** The partial download does not paint the full picture of what occurred as it does not reflect the distance and amount of time the posted speed was exceeded.  It does show however, the Claimant taking immediate action to reduce the speed of his train and train speed quickly decreasing as a result of these actions.  These actions by the Claimant can only be perceived as an effort to comply with the speed restriction and in no way do they reflect a blatant attempt to disregard the authorized speed.  Additionally, as testified by RFE Bush when questioned by Organization Representative Harvey, the Carrier did not perform a download of the event recorder on the lead locomotive for comparison purposes. **(Tr. 25, II. 34-41)**  The information gathered by performing such a download would have been useful by conveying a more detailed analysis of the events which occurred immediately prior to and following the incident.

While neither the Organization nor the Claimant attempts to minimalize the importance of observing posted speed limits, in this particular case it is obvious that a simple oversight was made as to where the speed restriction began and the absence of the warning boards, which should have been in place, compounded the situation.  It is

also worthy to note that absolutely nothing adverse occurred as a result of Claimant's oversight and therefore the Organization submits that the discipline assessed of full and final termination of employment from CSX Transportation is overly harsh and excessive. The Organization refers to Federal Railroad Administration Section 49, CFR 240.117 part (g) (3) (i), which outlines the federal penalty for a single de-certifiable event, as is the case at bar. **(Attachment A)**

> **49 CFR 240.117, (g)(3)(i) In the case of a single incident involving violation of one or more of the operating rule or practices described in paragraphs (e)(1) through (e)(5) of this section, the person shall have his or her certificate revoked for a period of one month.**

Additionally, the Organization refers to CSX Transportation Individual Development & Personal Accountability Policy (IDPAP) for Operating Craft Teammates, in which it defines Major Offenses and the progression of discipline for violations of such. **(Attachment B)**

| IDPAP - Major Offenses | |
| --- | --- |
| Definition | - Major Accidents<br>- Excessive speeding<br>- Stop signal violations<br>- Main track authority<br>- Stop test violations<br>- Blue Flag violations<br>- Dishonesty<br>- Other severe offenses |
| Progression | Removal from service - up to dismissal |
| | |

The Organization maintains that the CSX IDPAP policy does not require dismissal from service in all instances that fall into the category of "Major Offenses", but rather is discretionary and can range from "Removal from service- **up to** dismissal". (emphasis

mine)  In the case at hand, mitigating factors existed that should have been taken into consideration by the Carrier when assessing disciplinary action and should certainly be recognized by this Board.

To support our position the Organization relies on the findings National Railroad Adjustment Board Third Division Award No. 41390 Docket No. SG-41394 (Referee Knapp) in which it rules: **(Attachment C)**

> **"The Carrier contends that his admission of guilt is the end of the case. The Board cannot agree. Claimant Pullen must bear the consequences of his mistake, but the Board finds that there were significant mitigating factors operating at the time he sought authority from the Train Dispatcher to extend the crew's work between Smithshire and Stronghurst."**

Lastly, the Organization would focus the Board on the Claimant's many years of service with CSX Transportation.  At the time of his dismissal the Claimant had been faithfully employed with CSX for over fifteen (15) years as both a Trainman/Conductor and a Locomotive Engineer.  The Organization relies on the findings of National Railroad Adjustment Board First Division, Award No. 25433, Docket No. 45485 (Referee LaRocco) in which it rules: **(Attachment D)**

> **"Despite the Level 4 herein, the Claimant's many years of service is a mitigating circumstance justifying a reduction in the penalty.  The Board finds that the time the Claimant spent out of service should impress upon him his inviolate obligation to obey all Rules."**

Due to the above, we ask the Board to allow the requested remedy as set forth in the Statement of Claim herein.

Respectfully submitted,

Gary Best
General Chairman

# TABLE OF EXHIBITS

## J.P. Bennett CSXT ID 239613

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | FRA Section 49 CFR 240.117 (3 pgs.) |
| B | CSX Transportation IDPAP (3 pgs.) |
| C | NRAB Award No. 41390 |
|   | Docket No. SG-41394 – Referee Knapp |
|   | (7 pgs.) |
| D | NRAB Award No. 25433 |
|   | Docket No. 45485 – Referee LaRocco |
|   | (5 pgs.) |

**§240.117 Criteria for consideration of operating rules compliance data.**

(a) Each railroad's program shall include criteria and procedures for implementing this section.

(b) A person who has demonstrated a failure to comply, as described in paragraph (e) of this section, with railroad rules and practices for the safe operation of trains shall not be currently certified as a locomotive engineer.

(c)(1) A certified engineer who has demonstrated a failure to comply, as described in paragraph (e) of this section, with railroad rules and practices for the safe operation of trains shall have his or her certification revoked.

(2) A Designated Supervisor of Locomotive Engineers, a certified locomotive engineer pilot or an instructor engineer who is monitoring, piloting or instructing a locomotive engineer and fails to take appropriate action to prevent a violation of paragraph (e) of this section, shall have his or her certification revoked. Appropriate action does not mean that a supervisor, pilot or instructor must prevent a violation from occurring at all costs; the duty may be met by warning an engineer of a potential or foreseeable violation. A Designated Supervisor of Locomotive Engineers will not be held culpable under this section when this monitoring event is conducted as part of the railroad's operational compliance tests as defined in §§217.9 and 240.303 of this chapter.

(3) A person who is a certified locomotive engineer but is called by a railroad to perform the duty of a train crew member other than that of locomotive engineer, and is performing such other duty, shall not have his or her certification revoked based on actions taken or not taken while performing that duty.

(d) Limitations on consideration of prior operating rule compliance data. Except as provided for in paragraph (i) of this section, in determining whether a person may be or remain certified as a locomotive engineer, a railroad shall consider as operating rule compliance data only conduct described in paragraphs (e)(1) through (e)(5) of this section that occurred within a period of 36 consecutive months prior to the determination. A review of an existing certification shall be initiated promptly upon the occurrence and documentation of any conduct described in this section.

(e) A railroad shall only consider violations of its operating rules and practices that involve:

(1) Failure to control a locomotive or train in accordance with a signal indication, excluding a hand or a radio signal indication or a switch, that requires a complete stop before passing it;

(2) Failure to adhere to limitations concerning train speed when the speed at which the train was operated exceeds the maximum authorized limit by at least 10 miles per hour. Where restricted speed is in effect, railroads shall consider only those violations of the conditional clause of restricted speed rules (*i.e.*, the clause that requires stopping within one half of the locomotive engineer's range of vision), or the operational equivalent thereof, which cause reportable accidents or incidents under part 225 of this chapter, except for accidents and incidents that are classified as "covered data" under §225.5 of this chapter (*i.e.*, employee injury/illness cases reportable exclusively because a physician or other licensed health care professional either made a one-time topical application of a prescription-strength medication to the employee's injury or made a written recommendation that the employee: Take one or more days away from work when the employee instead reports to work (or would have reported had he or she been scheduled) and takes no days away from work in connection with the injury or illness; work restricted duty for one or more days when the employee instead works unrestricted (or would have worked unrestricted had he or she been scheduled) and takes no other days of restricted work activity in connection with the injury or illness; or take over-the-counter medication at a dosage equal to or greater than the minimum prescription strength, whether or not the employee actually takes the medication, as instances of failure to adhere to this section;

1

EMPLOYER EXHIBIT

Page ___ of 3

(3) Failure to adhere to procedures for the safe use of train or engine brakes when the procedures are required for compliance with the Class I, Class IA, Class II, Class III, or transfer train brake test provisions of 49 CFR part 232 or when the procedures are required for compliance with the Class I, Class IA, Class II, or running brake test provisions of 49 CFR part 238;

(4) Occupying main track or a segment of main track without proper authority or permission;

(5) Failure to comply with prohibitions against tampering with locomotive mounted safety devices, or knowingly operating or permitting to be operated a train with an unauthorized disabled safety device in the controlling locomotive. (See 49 CFR part 218, subpart D and appendix C to part 218);

(6) Incidents of noncompliance with §219.101 of this chapter; however such incidents shall be considered as a violation only for the purposes of paragraphs (g)(2) and (3) of this section;

(f)(1) If in any single incident the person's conduct contravened more than one operating rule or practice, that event shall be treated as a single violation for the purposes of this section.

(2) A violation of one or more operating rules or practices described in paragraph (e)(1) through (e)(5) of this section that occurs during a properly conducted operational compliance test subject to the provisions of this chapter shall be counted in determining the periods of ineligibility described in paragraph (g) of this section.

(3) An operational test that is not conducted in compliance with this part, a railroad's operating rules, or a railroad's program under §217.9 of this chapter, will not be considered a legitimate test of operational skill or knowledge, and will not be considered for certification, recertification or revocation purposes.

(g) A period of ineligibility described in this paragraph shall:

(1) Begin, for a person not currently certified, on the date of the railroad's written determination that the most recent incident has occurred; or

(2) Begin, for a person currently certified, on the date of the railroad's notification to the person that recertification has been denied or certification has been revoked; and

(3) Be determined according to the following standards:

(i) In the case of a single incident involving violation of one or more of the operating rules or practices described in paragraphs (e)(1) through (e)(5) of this section, the person shall have his or her certificate revoked for a period of one month.

(ii) In the case of two separate incidents involving a violation of one or more of the operating rules or practices described in paragraphs (e)(1) through (e)(5) of this section, that occurred within 24 months of each other, the person shall have his or her certificate revoked for a period of six months.

(iii) In the case of three separate incidents involving violations of one or more of the operating rules or practices, described in paragraphs (e)(1) through (e)(6) of this section, that occurred within 36 months of each other, the person shall have his or her certificate revoked for a period of one year.

(iv) In the case of four separate incidents involving violations of one or more of the operating rules or practices, described in paragraphs (e)(1) through (e)(6) of this section, that occurred within 36 months of each other, the person shall have his or her certificate revoked for a period of three years.

EMPLOYEE EXHIBIT

A

Page 2 of 3

(v) Where, based on the occurrence of violations described in paragraph (e)(6) of this section, different periods of ineligibility may result under the provisions of this section and §240.119, the longest period of revocation shall control.

(h) *Future eligibility to hold certificate.* A person whose certification has been denied or revoked shall be eligible for grant or reinstatement of the certificate prior to the expiration of the initial period of revocation only if:

(1) The denial or revocation of certification in accordance with the provisions of paragraph (g)(3) of this section is for a period of one year or less;

(2) Certification was denied or revoked for reasons other than noncompliance with §219.101 of this chapter;

(3) The person has been evaluated by a Designated Supervisor of Locomotive Engineers and determined to have received adequate remedial training;

(4) The person has successfully completed any mandatory program of training or retraining, if that was determined to be necessary by the railroad prior to return to service; and

(5) At least one half the pertinent period of ineligibility specified in paragraph (g)(3) of this section has elapsed.

[64 FR 60990, Nov. 8, 1999, as amended at 68 FR 10139, Mar. 3, 2003; 74 FR 68182, Dec. 23, 2009]

For questions or comments regarding e-CFR editorial content, features, or design, email ecfr@nara.gov.
For questions concerning e-CFR programming and delivery issues, email webteam@gpo.gov.

EMPLOYEE EXHIBIT

*A*

Page 3 of 3

3

# Individual Development & Personal Accountability Policy for Operating Craft Teammates including Train, Engine and Yardmaster Employees - Revised 7/7/08

**Purpose**

The professional development and well being of all contract employees is a critical element in CSXT's continued success. The vast majority of employees do their jobs in a professional manner, day in and day out. All contract employees are valued members of the CSXT team and must be treated with respect and fairness in accordance with labor agreements.

This policy is designed to provide everyone an opportunity to improve and grow through a measured, open, and just process. The Company's rules must be adhered to by all employees if we are to avoid injuries, deaths, and substantial financial losses. Violations of Company rules must therefore be addressed in an appropriate and effective manner.

**Responsibilities**

All CSXT employees are expected to be safe, conscientious, and dependable; to comply with rules; and display a positive attitude toward teamwork and Company objectives.

CSXT intends to continue to provide a safe work environment in which all employees can experience meaningful work and contribute to the success of the team. Managers must provide fair and consistent treatment to all employees under their charge, using alternatives to formal discipline wherever appropriate.

**General Guidelines**

Incidents that are considered minor deviations will be subject to handling in accordance with procedures described in Part I of this policy.

Incidents of a more serious nature will be subject to handling prescribed in Parts II and III of this policy. Examples listed in Parts II and III are illustrative only, and not intended to limit appropriate handling for other serious offenses that may warrant corrective or disciplinary action, including dismissal.

**Part I: Minor Offenses**

Minor offenses are defined as rule violations that do not result in derailment or damages to equipment and that are not otherwise identified as "Serious" or "Major" in Part II or III of this policy.

Managers are encouraged to utilize informal corrective instruction based upon individual circumstances. At minimum, the first two minor offenses committed by an employee in a three-year period will be handled with informal corrective instruction.

The main concern is with repetitive behavior. Repeated violations of the rules may require more focused intervention with each succeeding offense.

For the third minor offense committed in a three-year period, an employee will elect between the following two options:

- **Option A:** The employee will be offered the opportunity to participate in the "Incident review Committee" (IRC) process. The IRC is comprised of fellow craft employees selected by the appropriate Local Chairman. Corrective intervention will be determined solely by the IRC. The IRC will develop the root cause for the problem and prescribe appropriate corrective follow up. The only record maintained will be a note that the individual was referred to IRC.
- **Option B:** Customary handling under the Railway Labor Act and applicable collective bargaining agreement.

  For the fourth minor offense in a three-year period, a formal hearing will be conducted under the appropriate collective bargaining agreement and discipline of up to ten days suspension will be assessed if the employee is found responsible. The fifth minor offense will result in up to 30 days discipline if the employee is found responsible in a hearing and the sixth minor offense could result in dismissal.

Employees that work one hundred eighty days (180) without a minor offense will have one minor offense removed from consideration when determining the application of the policy.

**Part II: Serious Offenses**

This part of the policy describes the corrective action prescribed for a serious offense. A single serious offense will not be considered sufficient to warrant dismissal. However, suspension and/or retraining may be appropriate depending upon circumstances. Subsequent serious offenses within a three year period will be handled progressively.

1

EMPLOYEE EXHIBIT
B
Page 1 of 3

If an employee commits three serious offenses within a period of three years, the employee may be subject to dismissal. The employee's entire record will be taken into consideration when assessing discipline.

Serious Offenses include all rule violations resulting in a derailment or damages to equipment. Examples of Serious Offenses are: 3-step protection; coordination between crews working in the same and adjacent tracks; radio rules while shoving or backing; mounting and dismounting moving equipment; crossing over or riding the end of a car being shoved as defined in Safe Way Rule for Riding Equipment; engineer or remote control decertification events not considered Major offenses; shoving moves over crossings; protecting shoves; leaving cars in the foul; failure to have a proper job briefing; securing cars; securing locomotives; speeding; and switch and derail operation. Other incidents may also be considered Serious depending on the circumstances.

Progressive handling of serious offenses will be pursuant to the following:

For the first serious offense in a three year period, discipline of 5-15 days actual suspension will be assessed. For the second serious offense in a three year period, discipline up to 30 days actual suspension will be assessed. This assumes that a fair and impartial hearing under the terms of the applicable labor agreement has been conducted and the employee is found to be at fault; or, a waiver was exercised under the applicable labor agreement and the employee accepted responsibility. The actual length of suspension will be based upon the nature of the violation, the employee's record, and taking into consideration the employee's willingness to accept responsibility. At the discretion of the Division Manager, or designee, the employee may be offered the opportunity for additional training for up to one-half of the time actually suspended.

An employee with no formal handling under the IDPAP (including no IRC and no Time Out) and no serious or major offense within the previous three years may be offered an opportunity to participate in the "Time Out" process conducted by the Division Manager or his designee. This process will include voluntary and full participation by the involved parties to develop the root cause and corrective solution. The applicable local chairman is encouraged to attend. The only recorded information will be a note that the individual was referred to a "Time Out." There will be a list of action items retained to ensure follow-up is accomplished.

The third serious incident within three years may result in dismissal. This assumes that a fair and impartial hearing under the terms of the applicable labor agreement has been conducted and the employee is found to be at fault.

**Part III: Major Offenses Warranting Removal from Service Prior to Hearing**

Major Offenses are those that warrant removal from service pending a formal hearing and possible dismissal from service for a single occurrence if proven responsible. Examples of such offenses include: altercation, dishonesty, concealing material information or providing false material information about matters under investigation, theft, insubordination, Rule G, weapons on the property, excessive speeding (speed at or above FRA levels for decertification under 49 CFR Part 240), passing stop signals without authority, failure of stop tests using simulated obstruction devices or other similar operational tests, occupying track without authority, blue flag violations, major accidents, other acts of blatant disregard for the rights of employees or the company, and acts that cause harm to other persons or recklessly endanger the safety of employees or the public.

**Part IV: FRA Decertification Event**

Notwithstanding anything else in this policy, if an incident is covered by the FRA certification regulations, the involved employee is subject to those regulations and must satisfy the federally mandated revocation time period. Based upon the employee's record, acceptance of responsibility, and the employee's work history, the Division Manager, may elect with the employee's consent to provide additional training for up to one-half of the time the certification is revoked consistent with the requirements of 49 C. F. R., Part 240.

**Part V: Administration of Policy**

Responsibility for administration of the policy rests with Division Managers. A joint labor-management oversight committee will be established to review major discipline cases to ensure consistency and fairness in policy administration. The oversight committee will meet as necessary and will be chaired by the Vice President-Labor Relations. Other members of the committee will include the Vice President and Chief Safety Officer; the Assistant Vice President-Labor Relations; the two Regional Vice Presidents; and two each General Chairmen from BLE and UTU, designated by the involved labor organization.

**Part VI: Personal Injury Handling**

There will be no formal hearings solely to investigate an individual's personal injury. Formal hearings may be held to address rule violations resulting in harm to persons. The Individual Development and Personal Accountability Policy outlined herein sets forth the manner in which rules violations are to be addressed. An employee shall not be disciplined for an injury and an employee's injury record will not be considered in addressing the appropriate discipline for a rule violation.

All personal injuries must be reported to the appropriate supervisor at the time of occurrence prior to leaving the property on the day of occurrence so that prompt medical treatment may be provided and unsafe conditions can be promptly addressed.

(Exception: An employee departing the property to obtain urgent medical attention for a serious injury must report the injury to a supervisor as soon as practicable.)

Failure to adhere to these reporting procedures will subject the employee to appropriate handling under the IDPAP, up to the level of a Major Offense.

No provision of this policy shall be applied or interpreted inconsistent with federal or state law.

EMPLOYEE EXHIBIT
B
Page 2 3

### IDPAP - Minor Offenses

| | |
|---|---|
| **Definition** | Minor offenses include all rule violations that do not result in derailment or damages to equipment, and that are not otherwise identified as "Serious" or "Major" in Parts II or III of this policy. |
| **Progression** | 1 & 2 - ICI<br>3 - IRC or customary handling under applicable collective bargaining agreement<br>4 - Up to 10 days suspension<br>5 - Up to 30 days suspension<br>6 - Up to dismissal |
| **Time Frames** | Three (3) year rolling period<br><br>Six (6) months without minor offense will remove last minor offense from consideration in application of the policy |

### IDPAP - Serious Offenses

| | |
|---|---|
| **Definition** | Serious Offenses include rule violations that result in derailment or damages to equipment, and any rule violations or other incidents noted in Part II of the IDPAP policy. |
| **Progression** | 1 - 5-15 days actual suspension or time out at the discretion of management as provided in Part II of the policy.<br>2 - Up to 30 days actual suspension<br>3 - Up to dismissal |
| **Time Frames** | Three (3) year rolling period |

### IDPAP - Major Offenses

| | |
|---|---|
| **Definition** | - Major Accidents<br>- Excessive speeding<br>- Stop signal violations<br>- Main track authority<br>- Stop test violations<br>- Blue Flag violations<br>- Dishonesty<br>- Other severe offenses |
| **Progression** | Removal from service - up to dismissal |

3

EMPLOYEE EXHIBIT
B
Page 3 of 3

Form 1          **NATIONAL RAILROAD ADJUSTMENT BOARD**
                              **THIRD DIVISION**

**Award No. 41390**
**Docket No. SG-41394**
**12-3-NRAB-00003-100208**

The Third Division consisted of the regular members and in addition Referee Andria S. Knapp when award was rendered.

(Brotherhood of Railroad Signalmen

**PARTIES TO DISPUTE:**          (

(BNSF Railway Company

**STATEMENT OF CLAIM:**

> "Claim on behalf of the General Committee of the Brotherhood of Railroad Signalmen on the BNSF Railway Company:
>
> Claim on behalf of J. T. Pullen for reinstatement to his former position with compensation for all lost wages, including skill pay, with all rights and benefits unimpaired and any mention of this matter removed from his personal record; and for the following Claimants, C. K. Maurizi, S. R. McCormick, D. E. Peterson, Jr., for compensation of all lost wages, including skill pay, (35 day suspensions) and their personal record to be cleared of any reference to the discipline issued or to this event. Account, Carrier violated the current Signalmen's Agreement, particularly Rule 54, when it imposed the harsh and excessive discipline to the Claimants without providing a fair and impartial investigation and without meeting its burden of proving the charges in connection with an investigation held on November 14, 2008. Carrier's File No. 35-09-0003. General Chairman's File No. 09-001-BNSF-20-C. BRS File Case No. 14326-BNSF."

**FINDINGS:**

The Third Division of the Adjustment Board, upon the whole record and all the evidence, finds that:

The carrier or carriers and the employee or employees involved in this dispute are respectively carrier and employee within the meaning of the Railway Labor Act, as approved June 21, 1934.

EMPLOYEE EXHIBIT
C
Page ( 7

Form 1                                            Award No. 41390
Page 2                                           Docket No. SG-41394
                                              12-3-NRAB-00003-100208

        This Division of the Adjustment Board has jurisdiction over the dispute involved
herein.

        Parties to said dispute were given due notice of hearing thereon.

        The Claimants are members of a signal crew that was working on November 4,
2008, using a hy-rail boom truck to remove old signals on a stretch of track between
Galesburg, Illinois, and Fort Madison, Iowa, on the Chillicothe Subdivision. They were
all disciplined following an accident that resulted from their being out of track and time
authority: their truck was overtaken, rear-ended, and totaled by an oncoming train on the
same track. Fortunately, there were no injuries to the Claimants or any other Carrier
personnel. The accident was the result of a combination of factors. The crew had been
working all day on the stretch of track from Smithshire to Stronghurst. In the late
afternoon, Temporary Foreman J. Pullen, sought permission from the Train Dispatcher
to extend their authority on that same stretch of track. Initially, the Train Dispatcher
indicated that the crew would be able to do that, and the record includes a transcript of
the conversation between Pullen and the Train Dispatcher to that effect. However, when
the Train Dispatcher assigned the crew's actual authority, it was for the stretch of track
on the opposite side of Smithshire – from Smithshire to Ormonde. Despite verbally
confirming that authority, the Foreman wrote down the wrong track authority – from
Smithshire to Stronghurst, instead of from Smithshire to Ormonde. As a result, the crew
was on the wrong track at the wrong time. In addition, the Hy-Rail Limits Compliance
System (HLCS) a back-up safety system, was not engaged, so neither the crew nor the
Train Dispatcher realized that they were out of their limits. The crew's normal truck was
out of service, and the HLCS unit on the vehicle they were using was different than the
type of unit on which they had been trained. Nor were there any instructions in the boom
truck on how to operate it. In most vehicles, the HLCS unit is activated when the steering
wheel lock is released, whereas the HLCS unit in question had a toggle switch that
required separate, independent activation. Both units used the same or similar thumb
wheel for adjustment. The crew had been using the truck all week without realizing that
the unit was not activated. Following the Investigation, Claimant J. Pullen, the
Temporary Foreman, was terminated. The remaining crew members, who had been
withheld from service pending the Investigation, were ultimately assessed a Level S
suspension and returned to work after 35 days, when the Carrier completed the
Investigation and made its final decision.

        The Carrier contends that the discipline assessed to all the Claimants was
appropriate. There is no real dispute as to the facts, which have been acknowledged by
the Organization. Pullen was responsible for the initial error in writing down the wrong

EMPLOYEE EXHIBIT
C
Page 2 of 7

track authority, especially after having verbally confirmed the correct authority to the Train Dispatcher. The entire crew was negligent in failing to ensure that the HLCS was activated and working properly. Employees are trained regarding HLCS operation, and if there are any questions, they know whom to contact. Their failure to engage the HLCS meant that the Train Dispatcher was unaware of their location and the fact that they were out of limits, and was unable to notify the oncoming train in order to prevent the collision. The Investigation was conducted in a fair and impartial manner, and the testimony substantiated the charges against the Claimants. The Claimants' actions, or inactions, resulted in a collision between their hy-rail boom truck and a train. The discipline assessed was appropriate. The Foreman was terminated for his violation of Engineering Instructions 1.1.1 – Fouling Track, and Maintenance of Way Operating Rule 6.3.1 – Main Track Authorization. The remaining Claimants were assessed a Level S, time served, suspension of 35 days for their violation of Special System Instruction 21, Maintenance of Way Safety Rules S-1.1 – Job Safety Briefing, and S-1.2.5 – Safety Rules, Training Practices Policies.

According to the Organization, the discipline was harsh and excessive in violation of Rule 54, for a number of reasons. The Carrier unilaterally postponed the Hearing for its convenience, despite the fact that Rule 54 requires mutual agreement to any postponement. In addition, the Carrier improperly removed the Claimants from service pending the Investigation. They posed no danger to the Carrier or to any other individuals. In order to hold someone off service pending an Investigation, the Carrier must demonstrate that a serious infraction of the Rules has occurred and that the individual would endanger his safety or that of his fellow employees. It failed to do so here. Moreover, the penalty assessed against the three Claimants who were suspended – 35 days, or "time served" – was excessive. Finally, the merits of the case do not support the Carrier's decision to discipline the Claimants. There is no evidence that Claimants Maurizi, McCormick and Peterson violated any Rules while occupying Main Track One between Stronghurst and Smithshire on November 4, 2008. They had no part in the Foreman's clerical error and followed the instructions he gave them during the job safety briefing in the belief that they were working within their track and time authority. Moreover, the Claimants were not trained in or familiar with the toggle switch on the HLCS unit on Vehicle No. 19384. They believed that adjusting the thumb wheel switch on the unit was all that was necessary to operate the unit. Nor were there any instructions in the truck on how to operate the HLCS unit. Dismissal from service was too harsh a penalty for the Foreman, Claimant Pullen. He was an Acting Foreman with only one month's experience and with no training. He was not properly trained on the vehicle's HLCS unit. He made a serious mistake in writing down the wrong limits, but he had asked for and been told he would get one set of limits, then the Train Dispatcher gave him

EMPLOYEE EXHIBIT
C
Page 3 of 7

Form 1                                              Award No. 41390
Page 4                                            Docket No. SG-41394
                                             12-3-NRAB-00003-100208

a different set. Claimant Pullen was under the impression that he would receive his requested track limits and ended up copying down the wrong limits. This sort of clerical error has occurred before on the Carrier's property, but none of the other employees were permanently dismissed. The discipline assessed by the Carrier was solely to punish the Claimants, not to guide them in the performance of their work. The Board has held numerous times that it is an abuse of discretion for the Carrier to impose discipline only to punish the employee.

There is no dispute that the collision that occurred on November 4, 2008, was very serious, and indeed, the Claimants were lucky to have escaped without injury to themselves or others. There is a temptation in cases of such accidents to assume that the parties involved were guilty of the grossest Rules violations or negligence and to discipline them accordingly. Safety truly is a paramount concern for both the Carrier and the Organization. At the same time, it is important to examine the Claimants' actions and to make sure that any discipline imposed is proportional to the seriousness of their misconduct.

The record in this case establishes that the accident occurred as the result of two factors operating in combination: (1) the Foreman mistakenly wrote down the wrong track limit and (2) none of the Claimants were aware of how to properly operate the HLCS unit on the hy-rail boom truck they were using. Had either of these two conditions been different, the accident would not have occurred. The Board will address the three Assistant Signalmen, who were suspended, separately from the Acting Foreman, who was terminated.

Relative to Claimants Maurizi, McCormick and Peterson, the three Assistant Signalmen who were suspended for 35 days, the Organization raised three objections: (1) procedurally, they should not have been withheld from service pending the Investigation into the accident (2) the discipline imposed was harsh and excessive because they did not know that they were on the wrong track and (3) the discipline was harsh and excessive because they were not trained on the unfamiliar HLCS unit, nor were there instructions on how to use it on the boom truck. The procedural issue is entwined with the safety issue raised in the third of the Organization's objections, and the two will be discussed together. First, the Board will address these Claimants in relation to the crew being on the wrong track. The record clearly establishes that the Assistant Signalmen had no knowledge that they were not operating under the correct track and time authority, nor any reason to know that they were on the wrong track. They did not hear Pullen's conversation with the Train Dispatcher. The entire crew had previously discussed requesting authorization to extend track authority for the work they had been doing all day between Smithshire

Form 1
Page 5

Award No. 41390
Docket No. SG-41394
12-3-NRAB-00003-100208

and Stronghurst, and Pullen briefed them on that assignment after he wrote down the wrong track authority. As far as these three Claimants knew, they were working on the section of track for which they had received authority. As a result, they had no responsibility for the crew being on the wrong track, and any discipline imposed by the Carrier can only relate to their failure to realize that the HLCS unit was not engaged and operational.

Forces are expected to know how to operate all equipment to which they are assigned, including – perhaps especially – safety equipment. HLCS is a backup safety system, and had it been operational, both the crew and the Train Dispatcher would have known that they were outside their track authority well before the accident, in time for the crew to have moved the boom truck and avoided the collision. The Organization points out that the crew was not in its usual truck and had not been trained on the type of HLCS unit that was in the vehicle they were using. From the record, it appears that the unit lit up at some point when the truck was started, which led the crew to assume, incorrectly, that it was on and operational. Moreover, there were no instructions in the truck itself on how to operate the HLCS unit. The Organization further points out that since the accident, the Carrier modified its training and safety procedures to include training on the HLCS units with toggle switches and to require that Supervisors make sure that crews operating unfamiliar vehicles are briefed on all safety equipment that is different from what they are used to. It is true that the crew members should have double-checked to make sure that they were operating the HLCS unit correctly, but the Carrier's failure adequately to train and brief the crew mitigates – but does not entirely erase – their culpability. The Claimants must bear some responsibility for their role in failing to make sure that the HLCS unit was operating properly.

This brings the Board to the issue of the level of discipline that was imposed on the three Assistant Signalmen. The Carrier withheld them from service pending the Investigation pursuant to Rule 14, which permits the Carrier to withhold from service employees who have been charged with "serious offenses." All the Carrier knew in advance of the Investigation was that the Claimants' actions (and inactions) had resulted in a near-fatal collision that totaled their truck that would not have happened if proper safety procedures had been followed. It did not know who was responsible for what aspects of the safety failures that led to the accident. The crew members were informed in the Carrier's November 6, 2008 letter that the Hearing was being held to ". . . determin[e] your responsibility, if any, for your alleged occupying Main Track One  . . . without proper authority."   Occupying track without authority is a "serious offense." Accordingly, the Carrier did not violate Rule 54 when it withheld them from service. However, in light of the Carrier's failure to train the employees on all aspects of operating

EMPLOYEE EXHIBIT

Page 5 of 7

Form 1                                      Award No. 41390
Page 6                                     Docket No. SG-41394
                                          12-3-NRAB-00003-100208

the different HLCS units, the penalty imposed by the Carrier on the three Assistant
Signalmen was disproportionate to their misconduct. At most, they should have been
assessed a Level S, 30-day record suspension, and awarded the pay they missed while
being withheld.

     The facts involving the fourth Claimant, Acting Foreman Pullen, present different
issues for the Board to consider. Pullen is in the same situation as the other three
Claimants regarding the operation of the unfamiliar HLCS unit. But it was his mistake
regarding the time and track anthority in the first place that put the boom truck on the
wrong track at the wrong time. The record establishes that at the time of the accident,
Pullen believed that the Train Dispatcher had authorized the crew to continue to work
between Smithshire and Stronghurst. After hearing the transcript of the tape at the
Investigation, Pullen freely acknowledged that he had been mistaken and that the actual
track authority granted was between Smithshire and Ormonde. The Carrier contends
that his admission of guilt is the end of the case. The Board cannot agree. Claimant
Pullen must bear the consequences of his mistake, but the Board finds that there were
significant mitigating factors operating at the time he sought authority from the Train
Dispatcher to extend the crew's work between Smithshire and Stronghurst. For one
thing, Pullen had only been an Acting or Temporary Foreman for about three weeks.
Previously, he had substituted for other Foremen for a week here or there, but he was
significantly inexperienced as a Foreman. More important from the Board's perspective,
the transcript of the exchange between Pullen and the Train Dispatcher establishes that
their conversation was confusing and contradictory on the part of the Train Dispatcher,
which gave conflicting information to Pullen, with no recognition or acknowledgment of
the eventual change in authority from what he had initially indicated would be
forthcoming. In the audio transcript (included in the transcript of the investigatory
Hearing) Pullen first asks if his crew can "give One to you for Main Two between
Smithshire and Ormond and go ahead and take Smithshire to Stronghurst on Main One
instead?" The Train Dispatcher answered, "Yes. . . ." Pullen acknowledged that the crew
was going to release its original assignment. The Train Dispatcher queried "Smithshire
and Ormonde at 1418, 1-4-1-8 is that correct?" Pullen responded only that his crew was
releasing its earlier assignment. The Train Dispatcher stated, "I understand the BNSF
4607 is on by location requesting Smithshire, now Ormonde, now behind that train. Is
that correct over?" Despite the fact that he had not requested Ormonde, Pullen stated
"That is correct over." A few seconds later he acknowledged "Granted on Main One
track 018 track East crossover Smithshire switch now through to west crossover
Ormonde . . . ." The communications between Pullen and the Train Dispatcher were
conflicting and confusing, and the Train Dispatcher played a role in how events unfolded
when he initially told Pullen that his crew would be able to work between Smithshire and

EMPLOYEE EXHIBIT
C
Page 6 of 7

Form 1                                                                          Award No. 41390
Page 7                                                                       Docket No. SG-41394
                                                                      12-3-NRAB-00003-100208

Stronghurst, then appeared to have gotten confused about what Pullen was requesting, and finally granted track authority between Smithshire and Ormonde. Although Pullen verbally acknowledged the authority, the fact that he wrote down and briefed his crew on Stronghurst instead indicates that he did not, in fact, mentally register the change. Pullen's prior record was unblemished, and he appears to have been eager to do his job conscientiously and well. His mental slip was a common type of mistake that ordinarily would not have had serious consequences or been cause for termination. Had the HLCS unit been operating, the accident would have been prevented. From the Board's perspective, Pullen's mistake was not caused by gross negligence on his part, but by confusing and conflicting communications from the Train Dispatcher that anyone might have failed to pick up on. Pullen did make a mistake, in failing to register the change from Stronghurst to Ormonde, but the Train Dispatcher played a significant contributing role in the accident as well. It is the Board's considered opinion that Claimant Pullen was subject to significant discipline, but that discharge was excessive. He shall be returned to work with his seniority unimpaired, but without any backpay or benefits.

<u>AWARD</u>

Claim sustained in accordance with the Findings.

<u>ORDER</u>

This Board, after consideration of the dispute identified above, hereby orders that an award favorable to the Claimant(s) be made. The Carrier is ordered to make the Award effective on or before 30 days following the postmark date the Award is transmitted to the parties.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of Third Division

Dated at Chicago, Illinois, this 25th day of July 2012.

EMPLOYEE EXHIBIT
C
Page 7 of 7

Form 1          NATIONAL RAILROAD ADJUSTMENT BOARD
                         FIRST DIVISION

                                          Award No. 25433
                                          Docket No. 45485
                                          03-1-01-1-U-2619

        The First Division consisted of the regular members and in addition Referee
John B. LaRocco when award was rendered.

                         (Brotherhood of Locomotive Engineers
PARTIES TO DISPUTE: (
                         (Union Pacific Railroad Company

STATEMENT OF CLAIM:

        "Claim of Engineer D. D. Silvers for removal of Discipline, reinstatement,
        claiming all lost time (including time attending investigation), fringe
        benefits, and clearing of this notation of discipline from Engineer Silvers'
        record."

FINDINGS:

        The First Division of the Adjustment Board, upon the whole record and all the
evidence, finds that:

        The carrier or carriers and the employee or employees involved in this dispute
are respectively carrier and employee within the meaning of the Railway Labor Act,
as approved June 21, 1934.

        This Division of the Adjustment Board has jurisdiction over the dispute
involved herein.

        Parties to said dispute were given due notice of hearing thereon.

        By written notice dated August 28, 2000, the Carrier charged the Claimant,
an Engineer who had accumulated 33 years of service, with allegedly passing a stop
signal at 12:45 P.M. on August 21, 2000.

EMPLOYEE EXHIBIT
D
Page ___1___ of __5__

Form 1                                        Award No. 25433
Page 2                                        Docket No. 45485
                                              03-1-01-1-U-2619

  The Organization objected to the propriety of the notice for two reasons: First, the notice purportedly failed to specify the alleged infraction. Second, the notice did not contain a statement of the proposed discipline.

  The Board overrules both objections. The notice adequately apprised the Claimant and his representative of the nature of the charges. While the notice need not allude to any particular safety Rule, it was sufficiently precise to provide the Claimant and his representative with enough information so that they could (and they did) prepare a defense.

  Next, the record contains a dispute concerning whether the Claimant was at Level 2 or Level 4 on the Carrier's Upgrade discipline policy at the time that he was charged with this infraction. The Board will address this discrepancy later in the Opinion. In any event, the Claimant and his representative knew that running a red signal was a serious offense that could result in, at the minimum, the imposition of Level 4. Regardless of whether the Claimant was at Level 2 or Level 4, he realized that he could be severely disciplined. Nevertheless, there is nothing in the record to show that either the Claimant or his representative approached the Carrier about seeking a waiver of the Investigation. Therefore, the absence of the proposed discipline in the notice of charges did not prejudice the Claimant. However, we confine our ruling to the facts of this record. Nothing in this Opinion shall be construed to relieve the Carrier of its obligation to issue a notice of charges containing the mandatory elements set forth in the disciplinary Rule.

  At the Investigation held on September 19, 2000, the Manager of Train Operations testified that he was notified of an incident at MP142.5 near Marysville, Kansas, at 12:46 P.M. on August 21, 2000. When the Manager arrived at the scene at 1:00 P.M., he observed that the Claimant's coal train, CCXGU-20, had passed a red signal by about four and a half car lengths or more than 700 feet. Nobody was hurt. There was not any property damage albeit, the train fouled the adjacent track.

  When the manager interviewed the Claimant and the Conductor, they both acknowledged that the train went beyond the red signal. According to the Manager, the Claimant stated that he did not have any problem with the brakes. The Manager conducted a leakage test and the braking system passed.

EMPLOYEE EXHIBIT

D

Page 2 of 5

Form 1
Page 3

Award No. 25433
Docket No. 45485
03-1-01-1-U-2619

The Manager of Operating Practices later downloaded data from the event recorder from one of the units in the Claimant's consist. The data revealed that the Claimant's train passed the red signal going 34 miles per hour.

The Conductor and the Claimant both testified that they previously stopped their train four times before they reached the red signal at MP142.5. They also related that they knew they were following closely behind another train. The Claimant stated that the prior signal showed an approach and he understood that this signal required him to bring his train's speed down to 20 miles per hour and be prepared to stop.

The Claimant testified that, as soon as he heard his Conductor call the signal red, he placed the train into emergency. The Claimant guessed that the train was traveling at 35 to 40 miles per hour. The Claimant agreed that the train went about 724 feet past the signal. The Claimant asserted that the dynamic brakes might have been defective. The Claimant also intimated that this was the first time that he had operated a heavy, coal train across this particular subdivision suggesting that he was unfamiliar with how to handle the train on this territory.

Following the Investigation, the Carrier assessed the Claimant a Level 4, which the Carrier elevated to a Level 5 because, according to the Carrier's record, the Claimant was situated Level 4.

The Carrier submitted substantial evidence that the Claimant committed the charged offense. The Claimant conceded that the train passed the red signal but, more importantly, he admitted that the train was going well above 20 miles per hour when the Conductor called the red signal. The Claimant failed to abide by the prior approach signal.

The Claimant offered two flimsy excuses for his negligence, that is, he was inexperienced with operating a heavy train on the particular track and the brakes may have failed. Neither excuse is supported by evidence in the record.

The Claimant was fully qualified on the subdivision. Because he was a veteran engineer, he understood the intricate techniques of operating a loaded train. The Claimant did not exert any reasonable effort to reduce the speed of the train after the approach signal. Next, the brakes were working. The Claimant stopped the train four times previously without any difficulty. A later check of the brakes

EMPLOYEE EXHIBIT
D
Page 3 of 5

Form 1                                                                          Award No. 25433
Page 4                                                                          Docket No. 45485
                                                                                03-1-01-1-U-2619

revealed that the brakes were operating properly. Also, the Claimant did not claim that the brakes were defective when he was interviewed by the Manager of Train Operations immediately after the incident.

Based on the Claimant's admissions and the other corroborative evidence in the record, the Carrier presented substantial evidence showing that the Claimant was guilty of the charged offense.

Since the Carrier's Upgrade disciplinary program is instilled with progressive discipline, even a minor infraction can raise an employee to a Level 5 (dismissal) if the employee is already at Level 4. Thus, Level 4 is a serious disciplinary penalty because, in essence, it places the engineer at the precipice of dismissal.

In this case, there is a dispute regarding whether the Claimant was at Level 2 or at Level 4 when the Carrier assessed him with the Level 4 herein. The Organization declared that the Claimant was actually at Level 2, and so, the instant Level 4 punishment would have resulted in an ultimate discipline of Level 4. The Carrier contends that the Claimant was already at Level 4, so another Level 4 pushed the Claimant into permanent dismissal.

The record reveals that the Claimant was discharged in January 1997 and approximately ten months later, the Carrier reinstated him on a leniency basis. The Claimant was then purportedly placed at Level 4.5 on Upgrade. Less than two years later, during February 1999, the Carrier assessed the Claimant a Level 2 which, because of his prior discipline, was upgraded to Level 4. The record is unclear as to whether the Carrier properly applied Upgrade given that the record does not disclose all of the circumstances surrounding the leniency reinstatement including how fast the Level 4.5 would dissipate. The Board merely notes that the record does not contain any evidence that the Claimant filed a claim contending that the Carrier improperly computed the level of discipline under its Upgrade policy in February 1999.

Thus, from the record before us, the Board cannot definitively determine that the Claimant's disciplinary status was at Level 2. Since there was not a claim filed contesting the prior Level 4, the Carrier's records are deemed accurate.

EMPLOYEE EXHIBIT
Page 4 of 5

Form 1
Page 5

Award No. 25433
Docket No. 45485
03-1-01-1-U-2619

Despite the Level 4 herein, the Claimant's many years of service is a mitigating circumstance justifying a reduction in the penalty. The Board finds that the time that the Claimant spent out of service should impress upon him his inviolate obligation to obey all Rules. We note that, until recently, the Claimant had an excellent record as an engineer. The recent trend cannot continue. The Claimant must reestablish himself as an exemplary and outstanding engineer. Therefore, we are ordering the Carrier to reinstate the Claimant to service on a last chance basis. Further offenses, no matter how minor, will not be tolerated. The Claimant must understand that this is a final warning and he has one final opportunity to demonstrate that he can strictly obey all Rules.

Upon his reinstatement to service, the Claimant shall be placed at Level 4.5 on Upgrade, with his seniority unimpaired, but without pay for time lost.

## AWARD

Claim sustained in accordance with the Findings.

## ORDER

This Board, after consideration of the dispute identified above, hereby orders that an award favorable to the Claimant(s) be made. The Carrier is ordered to make the Award effective on or before 30 days following the postmark date the Award is transmitted to the parties.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 24th day of July 2003.

EMPLOYEE EXHIBIT
D
Page 5 of 5

# **Record of Handling**

## **J.P. Bennett CSXT ID 239613**

1) Charge Letter(s)
2) Decision Letter
3) Local Chairman's Appeal
4) Carrier's Response
5) General Chairman's Appeal

Exhibit A


TRANSPORTATION

West Jacksonville Offices
3019 Warrington Street
Jacksonville, FL 32254

C. G. Worth
Assistant Division Manager
Jacksonville Division

January 13, 2014
File Number 266286

**EXPRESS MAIL EM 727620007 US**

J P BENNETT
ENGINEER ID NO. 239613
44 BELLE GROVE CIR
RICHMOND HILL, GA   31324-3750

Arrange to attend a formal investigation to be held in Conference Room, 1401 Staley Avenue, Savannah, Georgia, commencing at 0900 hours (CSX Time), on January 23, 2014.

The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received that on January 3, 2014, at approximately 0005 hours, while working Q41002, in the vicinity of Milepost AN 584.4 and AN 584.5, you operated your train 14 mph over the maximum authorized speed, and all circumstances relating thereto.

**You are being held out of service pending this investigation.**

**P. R. Thomas has been charged under separate letter for same date shown above.**

You must be fully rested under the FRA Hours of Service Law to attend the scheduled investigation.

You may have representation in accordance with your working agreement and you may have witnesses present who have knowledge of the matter under investigation.

This will also serve as notification that effective immediately your FRA Engineer Certification is suspended pursuant to 49 CFR Part 240.307(b)(1) pending a revocation determination in connection with the incident described above. Your certification may subsequently be revoked for a period specified by 49 CFR Part 240.117. If you have not already surrendered your FRA Engineer Certificate to your Road Foreman, you must do so immediately upon receipt of this letter.

Federal regulations provide that you are entitled to a hearing on the revocation determination before an officer other than the field investigating officer. In accordance with the federal regulations, your revocation hearing will be consolidated with the formal investigation referenced above.

**If for some reason you are removed as principal, you are required to attend as a witness at the investigation if held for other employee(s) charged.**

C. Worth

mdm

cc:   R. R. Bush, Road Foreman of Engines - Arrange to be present as a witness
      P. R. Thomas (572454) – Charged under separate letter EM 727619998 US

**Where Safety is First**



West Jacksonville Offices
3019 Warrington Street
Jacksonville, FL 32254

D. K. Jones
Division Manager
Jacksonville Division

February 21, 2014
File Number 266286 - Discipline

**EXPRESS MAIL EM 728445848 US**

J P BENNETT
ENGINEER ID NO. 239613
44 BELLE GROVE CIR
RICHMOND HILL, GA  31324-3750

Reference the formal investigation conducted on January 23, 2014, commencing at 0925 hours, held in the Conference Room, 1401 Staley Avenue, Savannah, Georgia, in connection with information received that on January 3, 2014, at approximately 0005 hours, while working Q41002, in the vicinity of Milepost AN 584.4 and AN 584.5, you operated your train 14 mph over the maximum authorized speed, and all circumstances relating thereto.

As a result of the testimony and other evidence presented in this investigation, it has been determined that you did indeed violate CSX Transportation Operating Rule 40. For your violation of the above incident and due to the serious nature of the infraction, you are hereby dismissed in all capacities from the service of CSX Transportation effective immediately.

Additionally, you were informed in writing by letter dated January 13, 2014 that you were entitled to a hearing with respect to the revocation of your FRA Engineer Certificate and that such hearing would be consolidated with the formal investigation referenced above. Based on the facts as developed during the investigation, I find that your conduct not only violated the above-referenced rules, but also that a revocable event under the applicable subsection of 49 CFR part 240.117(e) occurred. Consequently, CSXT is revoking your FRA Engineer Certificate for thirty (30) days, from January 5, 2014 through February 3, 2014, pursuant to 49 CFR Part 240.117(g).

Arrange to return any company materials in your possession to the nearest CSX Location.

The importance of working safely and strict adherence to the operating rules cannot be emphasized too strongly.

D. K. Jones

Enclosure:  Transcript with exhibits (1)

/hml

cc:     DL Crew Management
        M. H. Harvey, Local Chairman- One (1) copy of transcript w/exhibits enclosed.
            EM 728445851 US

**Where Safety is First**

March 10, 2014

**Certified Mail**

Director—CSXT Labor Relations

6737 Southpoint Drive South  J-455

Jacksonville, FL 32216-6177

> RE:   Discipline of Engineer:  J.P. Bennett
>
>         CSXT ID# 239613
>
>         CSXT Discipline File #266286-Discipline

Dear Mr. Garcia,

      This to you in reference to the above captioned item and formal investigation held on January 23 ,2014 at Conference Room 1401 Staley Avenue, Savannah, Georgia which resulted in the dismissal of Engineer J.P.Bennett for alleged violation of CSX Transportation Operating Rule 40.

      Be advised that said assessment of discipline in unacceptable to this Committee. Accordingly; **appeal  is made** as per Article 30, Paragraph F. 1. of the current SSA.

**Employee's Statement of Claim**

      Claim of Engineer J.P. Bennett, ID# 239613 for full reinstatement to the service of CSXT as Locomotive Engineer.  Such reinstatement to include removal of all record of discipline administered by CSXT in this case from Engineer J.P.Bennett's  Personal Service Record, full pay for all lost time, (including hearing date), cumulative vacation and personal leave day rights undisturbed, seniority standing and progression unimpaired, all Health and Welfare benefits intact and unreduced, and full restoration of all other previously held rights and benefits thereto pertaining to Engineer J.P.Bennett's employment with CSX Transportation, Inc.

**Local Committee's Position**

      This Committee feels that this incident was a minor oversight and a professional judgment call on Mr.Bennett's behalf.  The Committee feels this was not an act of gross negligence.  Also, to point out, Mr. Bennett donates a major part of his free time to serving the community.  He has served in the mission fields of Haiti and has worked diligently while contributing countless hours to the underprivileged that CSX inclusion counsel serves.  He has also served CSX with 15 years injury free. Given his tenure of service with this company, if this dismissal holds true, this would be a devastating change of life for Mr. Bennett and his family.  We ask that the CSX handle this by returning  Mr. Bennett back to service on a lenience basis.

Mr. H.Joseph Garcia

March 10, 2014

Accordingly,and as per the foregoing, this Committee requests that Engineer J.P.Bennett be reinstated  in accordance with the Statement of Claim herein. Please advise me of your decision in this matter at your earliest opportunity.

Sincerely,

Michael M. Harvey

Local Chairman BLET Division 803



**H. Joseph Garcia**
**Director Labor Relations**

Labor Relations; J-455
6735 Southpoint Drive South
Jacksonville, FL 32216

April 28, 2014

Mr. Michael M. Harvey
BLET
Local Chairman Division – 803
1331 Woods Bridge Road
Jesup, GA 31545

Re:    J. P. Bennett - 239613
       CSXT File No. 266286
       LCAT File No. 2014-163289

Dear Mr. Harvey:

This refers to your appeal, dated March 10, 2014, appealing the Carrier's decision to assess dismissal to Engineer J. P. Bennett (239613) for his violation of CSX Transportation Operating Rules 40. Below is the Carrier's response.

## STATEMENT OF CLAIM:

Claim of Engineer J.P. Bennett, ID# 239613 for full reinstatement to the service of CSXT as Locomotive Engineer. Such reinstatement to include removal of all record of discipline administered by CSXT in this case from Engineer J.P.Bennett's Personal Service Record, full pay for all lost time, (including hearing date), cumulative vacation and personal leave day rights undisturbed, seniority standing and progression unimpaired, all Health and Welfare benefits intact and unreduced, and full restoration of all other previously held rights and benefits thereto pertaining to Engineer J.P.Bennett's employment with CSX Transportation, Inc.

## CARRIER'S STATEMENT OF FACTS:

This case involves the appeal of dismissal assessed to Engineer J. P. Bennett (Claimant) for operating his train *"...14 mph over the maximum authorized speed..."*

On January 3, 2014, Claimant was working the Q41002 in the vicinity of milepost AN 584.4 and AN 584.5. At approximately 0005 hours, Claimant and his Conductor allowed their train speed to operate 14 mph over the maximum authorized, a decertifiable event.

As a result of the incident, by letter dated January 13, 2014, Claimant was instructed to attend a formal hearing on January 23, 2014, in connection with the aforementioned charge. Due to the serious nature of the Rule infraction, and consistent with Company Policy, all crew members of the Q41002 were removed from covered service, pending the result of an investigation. The hearing scheduled and held on January 23, 2014, with Claimant and his representative in attendance. Based on the evidence and testimony presented during the hearing, the Carrier determined Claimant had violated CSXT Operating Rule 40. The Claimant was apprised of the findings and dismissed for a major rule violation and his FRA Engineer Certificate was revoked for thirty (30) days.

## CARRIER'S POSITION:

### 1. The Claimant was afforded a fair and impartial investigation under the provisions of the Agreement.

The transcript of the investigation clearly demonstrates that all of the Claimant's "*due process*" rights, as provided for under applicable rules of the Agreement, were fully protected and the hearing was conducted in a fair and impartial manner. Claimant was given proper notice of the charges, sufficient time to prepare a defense, the opportunity to produce and examine evidence, and the opportunity to present and cross-examine witnesses. Such handling was clearly in accordance with the procedural standards accepted in this industry.

The Organization did not take any exception to the charge or the investigation. The Organization requested in their appeal for the Claimant to be returned to service due to his years of employment and his community service.

The Carrier has provided the Claimant a fair and impartial investigation in accordance with the collective bargaining agreement.

### 2. Carrier has fulfilled its burden of producing substantial evidence of the Claimant's guilt.

Carrier produced substantial, probative evidence that established Claimant's negligence in this matter and supports that Claimant violated CSXT Operating Rule 40 The applicable rules read in pertinent part, the following:

### Speed Rules 40

*Train speeds must be maintained to the extent feasible consistent with safety and they must not be exceeded.* *Train speeds may be authorized by the rules, special instructions, signal indications, dispatcher messages or other means. When there is a difference in speeds, the lowest speed will govern.* (Emphasis added)

In this case, the evidence produced during the hearing and the testimony of Carrier Witness Robert Bush, Road Foreman of Engines (RFE) testified he received an ERAD notification of the Q41002exceeding the speed **(Tr. p 7)**. The crew should have been operating at a temporary speed reduction, temporary slow order which was 25 mph ; however, the crew operated their train at 39 mph **(Tr. p 7)**. The crew was made aware of the temporary speed restriction through a dispatcher bulletin **(Tr. p 8).**

The evidence presented during the investigation, including the ERAD report and the download of the locomotive, clearly demonstrates a violation of CSXT Rule 40. The evidence proves beyond a doubt that the train was operating in **excess** of **10 mph** over the 25 mph maximum authorized limit per the restricted speed zone

Claimant admitted to knowing about the Dispatchers Bulletin and having a job briefing **(Tr. p 36).**    Appellant testified he knew of the speed order and that applied the brake **(Tr. p 36).** Appellant also testified he saw the actual temporary speed restrictions sign **(Tr. p 37)** but does not recall at what speed he was traveling in **(Tr. p 38).** He did not dispute the Carrier's findings.

All of the testimony and corroborating evidence supports the Carrier's position that Claimant's guilt was established with substantial evidence. Consequently, the Carrier has met its burden of proof and the Organization is void of any probative evidence to the contrary. Lacking such evidence, the appeal must be denied.

### 3.    *The discipline assessed in this case was fully justified.*

The discipline was assessed in accordance with Carrier's long standing Individual Development and Personal Accountability Policy (IDPAP). The Rule infraction committed by Claimant is appropriately contained in Part III as a Major Offense (speeding), for which a single infraction, if proven guilty, can result in dismissal:

> *PART III:* Major Offenses Warranting Removal From Service Prior to Hearing
>
> *Major Offenses are those that warrant removal from service pending a formal hearing and possible dismissal from service for a single occurrence if proven responsible. Examples of such offenses include:  altercation, dishonesty, concealing material information or providing false material information about matters under investigation, theft, insubordination, Rule G, weapons on the property, excessive speeding (speed at or above FRA levels for decertification under 49 CFR Part 240), passing stop signals without authority, failure of stop tests using simulated obstruction devise or other similar operation tests, occupying track without authority, blue flag violations, major accidents, other acts of blatant disregard for the rights of*

*employees or the company, and <u>acts that cause harm to other persons or recklessly endanger the safety of employees or the public</u>.*

Excessive speeding on a locomotive recklessly endangers the safety of employees and the public. Permitting a train to operate at excessive speed, is an egregious event, and should result in severe admonishment.

The Carrier instituted IDPAP in response to the large number of violations of these rules, violations that could potentially result in serious injury or death to its employees or the public. Numerous Awards have upheld the Carrier's IDPAP Policy for major rule violations on all of its properties. Furthermore, a single Part III infraction can garner discipline up to dismissal even if the violation represents the employee's first major rule infraction. In <u>Award No. 4</u> of <u>Public Law Board No. 7263</u> (Wallin) the Board supported this position holding:

> *Given the content of the record, we must find that the Carrier's disciplinary decision is supported by substantial evidence. Claimant's Rule violations are categorized to be a Major Offense under the Carrier's disciplinary policy. The policy provides for dismissal upon finding of guilt for a single offense.*
>
> *Our further review of the on-property record does not reveal a proper basis for disturbing the Carrier's disciplinary decision. Accordingly, the claim must be denied.*

Additional authority for the one and done principle is also found in <u>PLB 6936, Awards 2</u> and <u>5</u> (Goldstein); <u>PLB 6879, Award 40</u> (Ross) and <u>PLB 6957, Award 68</u> (Parker) and <u>PLB. 6957, Award 13</u> (Domzalski):

Furthermore, discipline should not be overturned or reduced unless the penalty was unduly harsh or mitigating circumstances are found to apply. In the instant case, dismissal is within policy guidelines. In <u>Award No. 36</u> of <u>Public Law Board No. 7040</u> (Wallin)), the Referee noted the Board is an appellate review body and does not possess the jurisdiction or authority to offer leniency which is in the sole preview of the Carrier:

> *It is well settled by many awards of Pubic Law Boards and the National Railroad Adjustment Board that the mission of this Board is a limited one of appellate review. As a result, our role is essentially confined to reviewing the evidence to determine if the Carrier's disciplinary decision is supported by substantial evidence in the record developed on the property. If such substantial evidence is present, the Carrier's decision must be generally accepted by us. <u>This is so even though we may have a different disciplinary decision if that decision had been ours to make at the outset.</u>* (emphasis added)

The penalty of dismissal assessed Claimant was in accordance with IDPAP and cannot be considered harsh or arbitrary. Carrier also took into consideration Claimant's

discipline record. Moreover, employees who fail to heed the Carrier's Operating Rules imperil their relationship with their employer. The action taken in correcting unsafe actions is intended to reform the behavior of such employees to ensure they remain with CSXT.

This is not Appellant's first Major offense when he went through a red signal. In 2006, Claimant was offered a leniency reinstatement by the Division Manager. In addition, Appellant has numerous coaching and counseling and serious offenses on his disciplinary file.

In the instant case, Claimant failed to abide by Carrier's operating and safety standards and his excessive speeding is considered an egregious offense; therefore, the discipline imposed was warranted. Therefore, the case at bar should be <u>denied.</u>

**<u>SUMMARY</u>**:

The Carrier has demonstrated that Claimant was afforded a fair and impartial investigation in accordance with the applicable Agreement. Moreover, evidence and the testimony submitted at the hearing, established his guilt. The discipline of a dismissal was justified in accordance with the revised IDPAP. Under such circumstances, Claimant's dismissal was appropriate and the appeal is <u>denied</u> in its entirety.

Respectfully submitted,

H. Joseph Garcia
Director Labor Relations

# BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN

GENERAL COMMITTEE OF ADJUSTMENT
CSX Transportation - Eastern Lines
P.O. Box 490 - Abbeville, SC 29620-0490



Phone: 864.366.2538
Fax: 864.366.7050

**GARY BEST**
General Chairman

**CHRIS HYDE**
Vice General Chairman

June 30, 2014

ART 30
SSA

**MICHAEL TANNER**
General Secretary / Treasurer

## CERTIFIED MAIL

Ms. Melissa Wheaton, Director
CSXT Labor Relations
6735 South Point Drive South   J455
Jacksonville, Florida  32216-6177

RE:   **DISCIPLINE APPEAL** – J.P. Bennett (ID 239613)
        **CSXT File No. 266286 – LCAT: 2014- 163289**

Dear Ms. Wheaton:

Please reference your decision dated April 28, 2014, involving the Suspension/Dismissal of Engineer J.P. Bennett, ID 239613. Be advised that your denial of the appeal is unacceptable to this General Committee. Accordingly, I hereby request that we schedule a mutually suitable date, time, and location to conference not only this particular case, but any others that we deem appropriate. Our meeting should commence prior to the implementation of time limits as described in SSA Article 30, Paragraph F. 2. If for reasons beyond our immediate control said conference is not held and no other remedy for resolution is sought or accomplished during the process, this is official notification of my desire to extend time limits pursuant to SSA Article 30 G 1. Such request should be acknowledged and confirmed in writing before placing the case on a docket for final adjudication.

Therefore, and in connection with the above, I would request that you provide this office with a written response acknowledging this appeal letter and further advising of a date, time, and location for conference.

Sincerely,

Gary Best
General Chairman

cc: M.M. Harvey, LC – 803
    Division File 803
    DIS-19(14-803)
    J.P. Bennett, Claimant-803



A Division of the Rail Conference—International Brotherhood of Teamsters