# EXHIBIT C

# Award No. 23,
# Public Law Board No. 7694

## PUBLIC LAW BOARD NO. 7694

### Award No. 23

| | |
|---|---|
| **PARTIES** | Brotherhood of Locomotive Engineers and Trainmen |
| **TO** | -and- |
| **DISPUTE** | CSX Transportation, Inc. |

### STATEMENT OF CLAIM

Claim of Engineer J. P. Bennett (239613) for full reinstatement to the service of CSXT as Engineer. Such reinstatement to include removal of all record of discipline administered by CSXT in this case from Engineer Bennett's Personal Service Record, full pay for all time lost (including hearing date), cumulative Vacation and Personal Leave rights intact and unreduced and full restoration of all other previously held rights and benefits thereto pertaining to Engineer Bennett's employment with CSX Transportation, Inc.

### FINDINGS

The Board, after hearing upon the whole record and all the evidence, finds that the Carrier and Employee involved in this dispute are respectively Carrier and Employee within the meaning of the Railway Labor Act, as amended, that the Board has jurisdiction over the dispute involved herein and that the parties were given due notice of hearing thereon.

Claimant J. P. Bennett entered the Carrier's service on September 14, 1998 and was assigned in the capacity of Engineer on Train Q41002 on January 3, 2014.

The Claimant was dismissed from the Carrier's service following a formal investigation in connection with the following:

> ...information received that on January 3, 2014, at approximately 0005 hours, while working Q41002, in the vicinity of Milepost AN 584.4 and AN 584.5, you operated your train 14 mph over the maximum authorized speed, and all circumstances relating thereto.

On the subject date, a Bulletin had been issued for the Jesup Subdivision advising that there was a temporary speed restriction of 25 mph between mileposts AN 584.4 and

Public Law Board No. 7694
Award No. 23

AN 584.5. At the formal investigation, Road Foreman Bush testified that he received an ERAD[1] notification that the maximum speed of the Claimant's train had been exceeded on a portion of the road trip. The Road Foreman entered the download from the ERAD and the DVR from the Claimant's engine and stated that the data indicated that the Claimant was operating the train in excess of 39 mph in the area of the 25 mph temporary speed restriction.

The Claimant's testimony at the investigation was at times somewhat confused in that he initially indicated that he did not exceed the temporary speed restriction when entering the location but then acknowledged that if the download showed his speed at 39 mph "that's what we have to go by." The Claimant further testified that he was unsure of the speed of his train when he saw the temporary speed restriction sign but he knew he had to do something quickly to "get the train speed down for the safety of the crew."

The Organization, while not denying that the Claimant was operating in excess of the speed permitted by the temporary speed restriction, noted that both the Claimant and his Conductor testified that they did not observe an advance warning sign alerting them of the upcoming speed restriction. At the investigation, Road Foreman Bush stated that advance signs are usually placed about two miles prior to the temporary speed restriction sign. The Board is unable to determine from the record whether or not there was an advance warning sign posted on the date of this incident. While the Conductor stated that he did not notice an advance sign, he also indicated that he could have been looking at his work log and missed the advance sign. The Claimant stated that while he had no recollection of the advance sign, that there had been a job briefing, that he was qualified on the territory and knew the location of the speed restriction and that he did observe the temporary speed restriction sign. However, the Claimant was unable to state at what distance he observed the temporary speed restriction sign or at what speed he was operating at that time. The Board does not find that the presence or absence of an advance warning sign is controlling in light of the fact the Claimant knew the location of the speed restriction and despite this awareness, the Claimant demonstrated a lack of diligence when approaching the temporary speed restriction. The Board finds that the testimony of record establishes that the Claimant was guilty of operating his train in excess of the temporary speed restriction.

Relative to the discipline of dismissal assessed in this case, the Carrier states that the Claimant's operation of his train at an excessive speed through the area of the temporary speed restriction constituted a major offense under its Individual Development & Personal Accountability Policy (IDPAP) and that such policy provides that such violations may result in "dismissal from service for a single occurrence." The Organization, on the other hand, has argued that the discipline is excessive and that consideration should be given to the Claimant's years of service. While the Claimant had

---

[1] ERAD stands for Event Recorder Automated Download System which utilizes GPS technology to provide real time transmission of certain train handling data to a centralized location in Jacksonville, Florida.

2

Public Law Board No. 7694
Award No. 23

16 years of service at the time of this incident, the Board notes that during the Claimant's tenure he has been disciplined on several occasions for operating rule violations, including a previous dismissal for passing a stop signal. The Claimant has not demonstrated an ability to operate at the high level of safety that is required of a Locomotive Engineer. Accordingly, the Board will not disturb the Carrier's assessment of the discipline of dismissal.

## AWARD

Claim denied.

_____
Joseph M. Fagnani, Neutral Member

_____
Gil Gore
Employee Member

*dissent*

_____
Benjamin Mathews
Carrier Member

Dated: 7/15/2015

3

PUBLIC LAW BOARD 7694
Case No. 23, Award No. 23

## DISSENT OF THE ORGANIZATION MEMBER

The Organization must strongly dissent to the portion of the Award wherein the Majority upheld the level of discipline assessed to Claimant Bennett in this case. It is unconscionable that the Majority has blindly deferred to Carrier "Policy" in this regard. Although other Tribunals have held that carriers may set "Policy", such policies must never be allowed to dictate an outcome that offends just cause.

In Public Law Board Nos. 6264 and 6265, Referee Kasher found that Carriers have certain rights to promulgate policy. However, he qualified that right by recognizing that such policies, when challenged, must pass a test of reasonableness. He stated in pertinent part:

"It is well-established that an employer in exercising its management rights to publish and enforce rules of conduct is obligated to ensure that those rules meet the test of reasonableness,"

In Davis Fire Brick Co., 36 LA 124, 127 (Dworkin, 1960), the arbitrator ruled:

"Inherent in the contractual provision that an employee may be disciplined for just cause, is the fairness and reasonableness of the penalty. While the basis for discipline may be clearly established, unless the penalty is reasonably commensurate with the improper conduct of the employee, then "just cause" is wanting in regards the penalty imposed."

Under the IDPAP this Board's decisions have allowed the Carrier to pick and choose who will survive and who will not. The result is termination for one, but suspension for another. This is even so when employees with similar personal records are found to be equally culpable.

Gone are the checks and balances that would otherwise ensure that similarly situated employees are not treated disparately. Instead, the Carrier wields the ultimate penalty of dismissal at its whim, creating an employment environment with unequal terms and conditions that mimic an at will setting.

The collectively bargained checks and balances that require each and every case to be considered on its own facts and merits to ensure due process, and further, to ensure that employees are not disciplined without just cause have been neutered by Carrier Policy. Instead, when the level of discipline is challenged, the Carrier simply falls back on its "Policy" to defend what are in essence, indefensible actions. Just cause is obviously wanting and reduced to "just words" when arbitrary and excessive discipline is allowed to stand only because the Carrier proclaimed it to be a policy.

The arbitration process provided for in the Railway Labor Act anticipates that each and every case be considered on its own facts and merits and this expectation cannot be voided by the stroke of a Carrier's Policy pen. The IDPAP clearly states the purpose of the Policy as follows:

*'Purpose*

*The professional development and well being of all contract employees is a critical element in CSXT's continued success. The vast majority of employees do their jobs in a professional manner, day in and day out. All contract employees are valued members of the CSXT team and must be treated with respect and fairness in accordance with labor agreements.*

*<u>This policy is designed to provide everyone an opportunity to improve and grow through a measured, open, and just process.</u> The Company's rules must be adhered to by all employees if we are to avoid injuries, deaths, and substantial financial losses. Violations of Company rules must therefore be addressed in an appropriate and effective manner." (Emphasis Added)*

Carrier's heavy-handed discipline in the instant case has deprived Claimant Bennett of any opportunity to "improve and grow" as an employee.  Claimant was a sixteen (16) year employee of CSXT.  In its final decision, the Board referenced a nine (9) year old red signal violation by Claimant that occurred in March of 2006, which resulted in his dismissal.  Claimant's speeding charge in the instant case resulted in dismissal under the Carrier's Policy but only a thirty (30) day suspension of his locomotive engineer license under the federal regulations.  It is unconscionable that a nine (9) year old discipline entry that shows in Claimant's work history to be "Removed from consideration due to Policy 3 year rolling period" can be used to justify his termination.  The majority decision in this case has embraced Carrier's one and done IDPAP Policy to the benefit of the Carrier but ignored the Policy provisions that should have removed the red signal violation from consideration in Claimant's record. Carrier's failure to display a temporary speed restriction warning sign is a mitigating circumstance the Board should have given more weight.  A more appropriate decision would have been to reduce Claimant's discipline to a suspension allowing him the opportunity to return to service and again become a productive employee of CSXT.

This Board had full authority and a statutory duty under the Railway Labor Act and the Carrier's Policy to consider the level of discipline assessed to a sixteen (16) year employee in the instant case to be excessive but instead chose to ignore Claimant's long tenured career in favor of Carrier Policy. For the above reasons, I must respectfully dissent to the findings of the Majority in this Award.

Respectfully Submitted,

*[signature]*

Gil Gore, Organization Member
July 16, 2015